Good morning and happy New Year's to Your Honor, and may it please the Court. My name is Gautam Jagannath, and I and my colleague Emily Abraham are pro bono counsel for the petitioner in this case, Mr. Silva-Pereira. Before I begin, I'd like to request leave of court to reserve two of my 15 minutes for a response to the government's position. You may do so, Counsel. Just watch the clock. Thank you. This case presents a very unique circumstance for this Court. Not since 1986 in McMullen v. INS has this Court had an opportunity to revisit Congress's meaning of the serious nonpolitical crime bar. This bar is a reflection of our acceptance of a fundamental international value, the abhorrence of the atrocities that took place during the Holocaust. It is intended to prevent the admission as a refugee of certain criminals who are undeserving of refugee status. However, it is not a legal means for barring well-intentioned and deserving political refugees from seeking asylum. Today, I want to talk about the standard applied to determine if an applicant has such a serious nonpolitical crime as well as credibility. The McMullen precedent Well, what is the precise issue? Is it the probable cause determination? It is, Your Honor. It is probable cause, and it's Petitioner's belief that probable cause doesn't reflect Congress's plain meaning of serious reasons to believe. We've already solved that problem for you in Go. This panel cannot overturn Go, and Go says that probable cause is the test for the use. How do we how does your argument fare with that? We can't help you other than you have to show us where the application of Go is not appropriate, where here it's just a pure definition. In Go, we said it equals probable cause. Right. You say it doesn't, but only an embanked court can change Go. I mean, the decision has been made. Well, Judge Wallace, Go referred back to McMullen, and McMullen referred to Sedona v. Grant in the Second Circuit, and all of those cases summarily stated that probable cause was the appropriate standard. However, probable cause traditionally does not reflect the plain meaning of serious reasons to believe. I mean, when you say that, you say that, but we've already said the opposite. I mean, I hope that opinion in Go was written carefully. We tried to. And there we came to the conclusion that that is a fair analysis for us to take. How can we change that? How can this panel change that when you've made the decision in Go? Well, I think the guiding factor in Go and in McMullen is that the applicants for asylum in those cases freely admitted the facts that constituted the serious nonpolitical crime bar. This is a matter of first impression for this Court. No, no. That wasn't Go's facts. Well, Your Honor, in Go, if I recollect, the applicant did not contest the fact that he had committed those specific acts of violence. And that's the same case in McMullen. And that is the same case in Sedona. No, he contested. He said it didn't occur. And the person who came over to testify was not a valid person to testify. I don't read Go the same way you do. Right. And in the Second Circuit, which is the other circuit that has looked at this issue, we have another case called Cusum. And in Cusum, there was an Egyptian applicant for asylum who did not admit to the conduct that he had apparently engaged in. But in that case, the evidence against the applicant was so significant and detailed, the applicant was not a political refugee. And under no circumstance did he contest that the basis for the evidence that was used against him was somehow biased, as it is in this case. But this panel can't ignore existing Ninth Circuit precedent and jump to the Second Circuit. So I think you have your argument, but that would be for en banc review, not for the panel. Right. Your Honor, the immigration judge believed in this case, as we talked about, that serious reasons to believe was probable cause. Now, on page 39 of the government's responsive brief, the government posits that simply once the four-factor test of McMullen has been met, or in essence, the applicant fails the test, that the fact finder could and should determine the crime was nonpolitical, and thus that there are serious reasons to believe. But probable cause is a phenomenally low standard. And a long history of probable cause cases, from Terry v. Ohio to the present, are indicative of this. Probable cause typically means reasonable suspicion. Terry is reasonable suspicion. Right. So you're conflating reasonable suspicion and probable cause. Well, Your Honor, typically probable cause has held to meant reasonable suspicion in the law enforcement context. And that is the most well-developed body of law with respect to probable cause. And if we were to understand probable cause, we typically look at how probable cause has been applied in the law enforcement context. Well, your argument would be an interesting argument if this were a petition for rehearing en banc. But we can't change GO. GO says it's probable cause. Right.  But if this were a petition for rehearing en banc, is it your position that under GO you lose, that there is probable cause? Is that your argument? Well, simply under the current state of the law, Your Honor, under the Ninth Circuit, probable cause is the law. And it is Petitioner's contention that the plain meaning, as a matter of law and logic, should compel otherwise. But that's something we can't help you with. Only the court en banc can change GO. Is there another argument that you have beyond that one? Not at this time, no, on that issue. The correct standard, Your Honor, that the Petitioner believes would reflect  clear and convincing evidence. And serious reasons to believe is reflective of clear and convincing evidence because a standard, for example, as preponderance of the evidence would only refer to significant reasons. And in this case, when Congress enacted the law, Congress specifically put in serious reasons to believe, not just simply reasons to believe. Now, assuming that the plain meaning of probable cause were identical to serious reasons to believe and pose no semantic difference, and assuming this Court, as Judge Wallace said, were to hold fast to the probable cause as the standard, the government's assertion that probable cause existed as to both the Guatemalan and Salvadoran charges against the Petitioner misses the point completely. The very basis of this case is that the Petitioner argued and presented over 6,800 pages of record and testimony to show that the charges were, in fact, the very basis for the persecution and, in fact, that these charges were rooted in the biased, corrupt source of government persecution. And considering the testimony taken in the removal hearings, several expert witnesses, corroborating witnesses and testimony, the evidence points to the fact that the charges against the Petitioner were false, ginned up, and intended to persecute him for his political views and his political agenda to change El Salvador. Let us not forget that he was, he was, they were going to argue, and I'd like to have your responses, they were going to argue that there, there were serious reasons that he had an arrest warrant that was provided by the court, that he was stripped of his immunity by the legislative assembly, even members of his own party, that a person has been found guilty, that he bribed the person, he went to jail for it, and they're going to say that shows probable cause. So tell us why they would be wrong in making that argument. Right. Well, the immigration judge reliance on the warrant in this case was flawed because the Petitioner, through counsel below, presented significant testimony to show that this warrant was biased and inherently not trustworthy. And our law should not permit simply an immigration judge to rely on such a faulty warrant when there is some indication to indicate that it is unreliable. What was the foreign State's law concerning the standard for issuance of a warrant? That is something that was not in the record, and we do not have any information about that. But the fact that you bring that up, Judge Huff, is important because, because we don't have that evidence and that evidence wasn't presented. We simply cannot state that the warrant was procured to any standards of due process that meet our standards here in the United States. What case do you rely on that they have to meet our standards in the United States? I don't have any case for that, Your Honor. But I read your gold standard argument, and I wondered, have we ever held that they have to find out if they do it the same way we do? Right. I did not encounter such a case at all in my research. I have neither. But the fact of the matter remains in this case, the determination of something so critical as eligibility for refugee status cannot be left simply on the basis of fabricated documents. And when the Petitioner presents a fairly solid case as to why the documents being used against him are faulty, the immigration judge should not be permitted simply to apply a low standard of probable cause typically used for the apprehension of individuals, not for the ultimate decision-making in a case. Suppose, suppose, suppose we take the position that we're going to look and see whether or not probable cause, that he measured up to probable cause. How would you argue that there wasn't probable cause based upon, he had to make a decision who he believed, and the credibility issue is really left up to the administrative law judge as approved or disapproved by the Board of Immigration Appeals. So how would you argue that if we have to use probable cause, that there wasn't sufficient based upon the determination of credibility being left to the administrative law judge? What would be your argument? I think it's a very difficult one, Your Honor, because probable cause is a phenomenally low standard. And some, a scintilla of evidence could logically lead a fact finder to determine there is probable cause. You keep saying that. I remember probable cause is a standard that we use in criminal case to deprive people of life and liberty and they may not have, it's not a low standard. It's a standard that's recognized in many other contexts. So I don't agree that it's a scintilla of evidence. But it is the lowest standard that we have in criminal law. And when we apply that here in the civil context, we essentially eviscerate the meaning of what it means to have a serious nonpolitical crime bar. When Congress adopted, when Congress adopted the basic, the wording of the convention, its intention was to prevent individuals from committing atrocities with impunity. So individuals such as Hitler who may not have received a conviction, it was not meant to simply permit an immigration judge to take shreds of evidence and say, well, this individual cannot qualify for a refugee status. And have you got a case in the circuit that helps you with that? Or is this a new argument that we are in today? No, Your Honor. This is an argument that's based simply on the plain meaning of the statute. We don't have, you don't have any legislative intent that you could cite to us that that's what Congress actually meant. No, Your Honor. I did look for that. I couldn't find that. Yes, I didn't. I have less than two minutes, Your Honor. So let me submit on this and then I will come back. Thank you. I do want to commend you for your pro bono activities. Great. Thank you. Thank you, counsel. We'll hear from the government. Good morning, Your Honors. May it please the Court. Timothy Hayes on behalf of the Attorney General. The Court should deny the petition for review. The Salvadoran and Guatemalan charging documents and the processes attached to their issuance establish a requisite reason to believe that Mr. Silva may have committed serious nonpolitical crimes outside the United States, which disqualifies him from receiving asylum and withholding removal. And given Mr. Silva's stature and his case's notoriety in Latin America, the agency reasonably concluded that Mr. Silva failed to establish that he would be tortured in either country should he be returned. Well, going to the main argument, the opponent suggests that the evidence that the I.J. relied on is phony or faulty in some way and doesn't even meet the standard of probable cause. What's your response? Well, I don't think below it was ever argued that the evidence was fabricated. It was argued that the evidence has trumped up charges, not that the charging documents were improperly issued or that the courts didn't act appropriately. It was more he was targeted for inappropriate reasons and he didn't do these crimes. And my response is there's plenty of process attached in both countries to the issuance of the documents. If we focus on the Salvadoran charges first, we have two tribunals. We have the legislative body voting 82 to 1 to strip him of legislative immunity. And in many Central American countries, before a congressman can be subjected to criminal prosecution, his legislative immunity has to be lifted. Now, what's surprising about this is this is across all the political parties. Even his own congressman who was above him, he was a deputy, deputy congressman, abstained from the vote. He didn't actually vote no. The only person that voted no was a person that disputed the process generally. So we have the Salvadoran legislator on one hand doing that. Then we have a Salvadoran criminal court that held hearings as to whether to issue an arrest warrant for Mr. Silva. Mr. Silva had counsel at those hearings. Those hearings lasted a series of days. In fact, he excused himself in the last hearing based on a phony doctor's note saying he was unable to attend because he was too sick, when he admitted on the stand that he was able to attend. And he just fled El Salvador right when the arrest warrant was issued. Turning to the Guatemalan charges, we have there an indictment that came down from a Guatemalan court. Now, this one's a little bit more or I should say less clear because we know the Salvadoran court relied on 41 days of hearings. They had 41 days of hearings. And what linked Mr. Silva to the murders was a witness who the administrative record only identifies as Judas that linked Mr. Castillo, who was a Guatemalan congressman, to Mr. Silva. They both were present at meetings supposedly planning these murders. Now, what the administrative agency held is they didn't hold that Mr. Silva did these crimes. We don't know whether he did these crimes. All they held is that there was enough evidence on this record to give probable cause that he may have committed these crimes. And that's all that's necessary under the standard. And going to the standard, I want to touch on that McMullen actually said probable cause. So we have this court from 1986 saying probable cause. Go reaffirm to McMullen. And McMullen was actually a board case. So the board has said we believe the plain language of the statute is probable cause. And the Second Circuit also follows that. In fact, I'm aware of no court that puts a higher standard than probable cause. And they shouldn't because the fact of the matter is a foreign country's judicial process is not on trial in an American administrative hearing. Now, I do want to make clear that the board did not say that just because a Guatemalan court issued an arrest warrant or the Guatemalan court issued an indictment that that's per se enough. They did analyze whether it appeared that their country's probable cause was followed. And they were, based on what they saw before in the record, they said there was enough cause there. But they didn't hold a per se rule. And unless the court has any more interest in that, I just want to touch on the credibility finding because I know my colleague mentioned it. It's not necessary for the court to actually reach that credibility finding. And that's primarily because the agency held that the Guatemalan and Salvadoran charges independently disqualified Mr. Silva from asylum and withholding removal. So even if one was overturned and the other stood, he would still lose on that point. Mr. Silva only testified once at the first round of hearings. There were three rounds of hearings before two different immigration judges. When the Guatemalan charges were brought to light and the DHS elected to pursue the serious nonpolitical crime bar, Mr. Silva elected not to testify again. So all we have is his testimony pertaining to El Salvador. We have no testimony pertaining to what happened in Guatemala or anything pertaining to Guatemala. So there's nothing that his testimony could shed light on that would require the court to review a credibility finding in order to have the Guatemalan charges stick. So it's not necessary. Although we do, and I'll rest on the briefs unless the court has a question, we do hold that substantial evidence does support the credibility finding. You mean the lack of credibility finding? Oh, you're right. I'm so used to saying adverse credibility finding that I forgot to put the adjective. You're right, Your Honor. The adverse credibility finding. Okay. And then I'll turn to the Convention Against Torture information. Now, the agency analyzes two different ways, which is a little atypical. They analyzed it in the Salvadoran context and the Guatemalan context. And it seems to me the reason why they did that is they were pretty assured by the extradition evidence in the record that if he was returned to El Salvador, there's a likelihood that he would be extradited to Guatemala. So they analyzed torture from both perspectives, whether he stayed in El Salvador and served trial or whether he was extradited to Guatemala and served trial. So I'll split that up into both countries. Beginning first with the El Salvador, the IJ found that Mr. Silva would stand trial, would not be killed if returned, given his stature and the case's notoriety. And there's evidence in the record to support his position on that. Mr. Silva's wife was acquitted on about half of her charges. And his mother-in-law was also charged with similar crimes as to him, and she was acquitted on all charges. Plus, Agent Parker, when he did his investigation in El Salvador, a lot of the mayoral candidates and persons that he talked to said that there's a possibility that the trial could be fair and impartial. They weren't saying that every judge is corrupt or that Guatemala was entirely corrupt. There is a level of corruption, but they were saying that there's a chance this could be assigned to a fair tribunal. And the immigration judge linked that with the fact that there's a lot of international observers following this case, that it is very likely that Mr. Silva would get a fair shake if he was returned to El Salvador. Isn't that the same analysis that we followed in Go, that the person was of such high visibility that the chances are the Philippine government would not torture him or give him an improper trial? It seems to me that that analysis is the same one that was followed in Go by our court. Yes, Your Honor. And I believe the board actually explicitly cited Go for that reason in its decision here. So that is the same analysis. And then what about the country conditions in El Salvador? The country conditions evidence does state that there is corruption in the El Salvador system. And I don't think anyone would dispute that. It's also very prevalent in Guatemala. But it didn't say it was ironclad. It's not as if no one can get a fair trial. And I know how that sounds. It does sound horrific. But we're talking about a clear probability that he would be tortured. So we'd have to sort of link a clear probability that not only — I'm sorry, Your Honor. I thought someone said — we would have to link a clear probability not only that it's a sham sort of trial and that he'd be in prison, but also a clear probability that he'd be tortured. Because I don't know of any court case that stands for false imprisonment is equivalent to torture. So it's a very, very high burden. And I believe their argument is if he was in prison in either country, there would be a high probability that he would be tortured. And I don't know of any court case that stands for false imprisonment, which would lead to him being tortured as a legal argument. But that's, you know, speculation upon speculation. You have to show that each chain in the causal link, not only would he be falsely arrested, but that he would — or he would be falsely charged, but he would be falsely convicted, and then that he would be tortured. So each level of that has to be more likely than not. And that just hasn't been shown in this case. And unless the Court has any further questions. No further questions. Thank you, Counsel. Thank you. Mr. Jagannath, you have some reserved time. Thank you. I just want to mention that the Salvadoran and the Guatemalan charges are connected. The fact that they are separate doesn't mean that they provide independent evidence, because they come from the same source of biased, corrupt government. The government attorney pointed out to the fact that there was, quote, plenty of process. But the process, from the Petitioner's perspective, was essentially a sham trial in a kangaroo court. And it — the evidence that came from that is not inherently trustworthy. And the expert testimony in the administrative record shows that. One other point about credibility is that this Court has held time and time again that corroborative evidence, standing alone, setting aside the testimony of the applicant, can satisfy the applicant's burden. And in this case, even if this Court were to find that the testimony of the applicant was not sufficiently detailed, or if it was not credible, that the other sources of evidence from the experts and the country conditions could stand alone. However, the Petitioner's failure to testify in a semantically precise manner, he made a few errors with regards to dates. He neglected to put in a few instances of persecution, and his application should not cause his entire testimony to be discredited. The Petitioner believes the matter should be remanded so that the immigration judge can look at these issues. Kennedy to the Court.    Mr. Rice. Mr. Rice, you pushed that too far. The IJ found he was not credible, he was not believable. And there — what we have under our law, we grant that unless we feel the evidence that we're compelled. Compelled, I think, is the words that we've used, to feel otherwise. That's a pretty tough burden. You're just indicating that he didn't have enough, that the IJ didn't have enough, but he did make the determination.  And it's an odd one, Your Honor, because initially the applicant was denied relief, then it went to the board, it was remanded, and then he was granted relief. Well, you recall the IJ thought that he had to — Right. To credibility. Right. The board told him he was wrong on the law, and then it was sent back. And then it was the third IJ that actually made the finding, who was fresh into the program. So it's pretty hard to make the argument that we can reverse that, unless we feel compelled to do so, which is a very high burden. Well, unless the issue preclusion issue of the law of the case comes up in that circumstance, because the government had a full opportunity to litigate the issue of the bar, and it failed to do so initially. It can't be law of the case that the IJ said, because the board reviews it and can reverse. Right. But the immigration judge had to make certain factual findings in order for the applicant to qualify for relief. And those findings have to be preserved. Well, the findings themselves had to be reversed because he used the wrong standard of review. He thought he had to accept the credibility. So the board then reversed on that basis. So that opens the record for the IJ to start over again and to make sure that it was fair. They went to a third IJ. I don't see how your — I don't see your argument on that the first IJ's determination has to stand. I think it's — Do you have a case, a close case on that? It's actually the second. It's the second determination after it was remanded once. I do have one case that points to the fact that the issue preclusion doctrine does apply in this circumstance, and it is Gonzales v. U.S. Department of Homeland Security. Is that an administrative judge, NALJ? Yes, I believe so, yes. Gonzales? And in that case, they said that the law of the case would not apply only in a circumstance where there was a substantive change in the law. Is that case in one of the briefs? I believe it might be in the reply brief, Your Honor. In your reply brief. Yes. Thank you. Anything further? Nothing. Thank you. Thank you, counsel. The case just argued will be submitted for decision, and the Court will adjourn.
judges: Wallace, O'scannlain, Huff